# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ARQUINCY LEE CARR,

           Plaintiff,

     -vs-                                      Case No.   11-CV-363

DAVID BETH, ANDY LEITING,
CARLOS GERENA, JEREMY MAY,
THOMAS CARRAO, CORPORAL T. HANEY,
SGT. RAY WILLSTEAD, NURSE LYNDSEY HAUCK,
SGT. BERNHARDT, and STEVE RAE,

           Defendants.

## DECISION AND ORDER

        The plaintiff, ArQuincy Lee Carr, who is incarcerated at the Columbia Correctional Institution, filed this pro se civil rights action pursuant to 42 U.S.C. § 1983 and was granted leave to proceed in forma pauperis. Defendants David Beth, Andy J. Leiting, Carlos Gerena, Jeremy May, Thomas Carrao, Corporal T. Haney, Sergeant Ray Willsted, Sergeant Bernhardt, and Steve Rae ("Kenosha County defendants") have filed a motion for summary judgment. Defendant Nurse Lyndsey Hauck, who is represented by separate counsel, has also filed a motion for summary judgment. These motions are ready for resolution and will be addressed herein.

        The plaintiff was a pretrial detainee at the Kenosha County Jail at all times relevant to this action. He claims that the defendants violated his constitutional rights regarding an incident that took place on December 28, 2010. Specifically, the plaintiff alleges that defendants Leiting,

Gerena, and May physically assaulted him; defendants Carrao and Willstead failed to intervene in the use of excessive force; defendants Carrao, Willstead, and Hauck denied him medical care following the incident; and defendants Haney and Bernhardt denied him due process with regard to discipline he received after the incident.

## I. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

2

## II. FACTS[1]

**A. Kenosha County Defendants' Proposed Findings of Fact**

On December 28, 2010, the plaintiff was an inmate at the Kenosha County Jail ("Jail"). He was incarcerated as a result of charges of victim intimidation, battery, and strangulation and suffocation. The plaintiff was transferred to the Jail from the Racine County Jail on October 7, 2010, and was transferred to a Wisconsin state prison on October 20, 2011, where he remains incarcerated. Defendant David Beth is the Kenosha County Sheriff. At all times relveant, defendants Andy J. Leiting, Carlos Gerena, Jeremy May, Matthew Bernhardt, and Steve Rae were corrections officers employed at the Jail; defendants Thomas Carrao and Timothy Haney were corporals employed at the Jail; and defendant Raymond Willstead was a sergeant employed at the Jail.

While the plaintiff was incarcerated at the Jail, staff discovered that he was hiding contraband, including plastic bags, a magazine, and a pair of latex gloves, in his cell. In order to investigate the issue and determine the source of these prohibited materials, officers conducted daily inspections of the plaintiff's cell beginning approximately one week prior to the incident that is the subject of this lawsuit. The Jail Inmate/Detainee Handbook provided to the plaintiff states that these kinds of "routine and random inspections" will be conducted to assure compliance with the Jail's rules on contraband. (Willstead Aff. ¶ 12, Ex. B at 10.)

On December 28, 2010, the plaintiff was on disciplinary status and housed in

---

[1] This section is taken from the Kenosha County defendants' Proposed Findings of Fact and from defendant Hauck's Proposed Findings of Fact. The plaintiff did not file a response to the defendants' proposed findings of fact nor did he file any admissible evidence in response to the summary judgment motions. The defendants' proposed findings of fact are therefore undisputed. *See* Civil L. R. 56(b)(2) (E.D. Wis.).

disciplinary segregation for several prior major rule violations, including the continued presence of contraband in his cell. Jail policy provides that inmates on disciplinary status be properly secured with an authorized form of mechanical restraint, including handcuffs, a treatment belt, or an escort belt, when outside of their cell. That day at 3:30 p.m., defendants Leiting and Gerena began the cell inspection process by removing the plaintiff from his cell and transferring him to a holding cell. The officers, who secured the plaintiff with an escort belt while transferring him to the holding cell, informed Officer Craig Knecht and defendant Bernhardt of the transfer and asked them to monitor the plaintiff in the holding cell while Leiting and Gerena searched the plaintiff's cell. Through the use of the escort belt, the plaintiff's hands were secured in front of his body in handcuffs that were attached to a belt around his waist. The escort belt is fastened with a series of three Velcro straps that wrap around the inmate's body. When an inmate has a small waist, as was the case with the plaintiff, any excess portion of the straps may be tucked into the belt out of the inmate's reach. Defendant Gerena secured the plaintiff's hands in the handcuffs attached to the belt and checked the belt for proper fit while double locking the handcuffs.

Once the plaintiff was in the holding cell and the holding cell door was secure, he immediately tried to extricate himself from the escort belt by twisting and pulling his arms in an attempt to grasp at the belt's straps. The plaintiff reached for the end of one of the Velcro straps tucked into the belt in an attempt to unwrap the strap and remove the belt entirely. Through his actions, the plaintiff was able to reach and loosen the Velcro strap on the belt, which compromised the restraint system and posed a threat to both the officers and the plaintiff. In order to re-secure him, defendants Leiting and Gerena entered the holding cell and ordered the plaintiff to kneel on the bench against the cell wall. Putting an inmate into a kneeling position is a common practice utilized

4

by correctional institutions to maintain a control advantage for officers.

Defendants Leiting and Gerena were able to secure the plaintiff's arms, but he resisted their verbal orders to kneel against the wall and would only put one leg onto the bench. In order to move the plaintiff's other leg onto the bench so that the officers could secure him in a kneeling position, defendant Leiting used his left leg to maneuver the plaintiff's leg into place while using his arms to keep control of his right arm. The plaintiff continued to resist the officers' commands and control holds. He head-butted defendant Leiting on the left side of his face. The plaintiff simultaneously pushed the officers backward toward the cell wall. He threatened to kill the officers. In response, defendant Leiting used decentralization techniques, including three strikes to the plaintiff's legs and an elbow strike to his midsection, while defendant Gerena attempted to control the plaintiff's head and his descent to the ground. The officers continued to issue verbal commands to the plaintiff to stop resisting, but he refused to comply and continued to kick and fight against the officers throughout the entire incident.

Through his resistance, the plaintiff had pushed the officers into the corner of the cell. As a result, defendant Leiting repositioned himself in front of the plaintiff in order to secure his head. Defendant Leiting utilized a control tactic by applying pressure to the plaintiff's "mandibular angle." As defendant Leiting attempted to control the plaintiff, Officer Knecht and defendant Bernhardt entered the cell, and Knecht secure the plaintiff's legs while Bernhardt secure his torso. Defendant Gerena continued to order the plaintiff to stop resisting.

At this time, defendant Corrao arrived and radioed for assistance, requesting the restraint chair and a spit hood for both the plaintiff's and officers' safety. Defendant May responded to the call and observed the officers restraining the plaintiff when he arrived. Officers Daniel Lahare

5

and LaShonda Gray, and defendant Willstead also responded. The officers then carried the plaintiff out of the holding cell and placed him into the restraint chair. He continued to resist by kicking and threatening to kill the officers while they worked together to secure his legs. The officers instructed the plaintiff to sit back in the chair but he refused. As he continued to resist, the plaintiff thrust his body forward in an attempt to get out of the chair. As defendant May attempted to control the plaintiff's head, he continued to pull away and attempted to jump out of the restraint chair. As defendant Leiting reached for the waist belt on the restraint chair to secure it, the plaintiff attempted to head-butt him again. Officer Lahare pulled the waist belt strap to secure it while the plaintiff continued to resist.

Once fully secured in the restraint chair, the plaintiff continued to threaten the officers and bragged about head-butting defendant Leiting. The plaintiff was escorted to the Health Services Unit ("HSU") for the standard restraint check and monitoring. As he was transported, the plaintiff continued to threaten staff and stated that he was going to kill defendant May and his family when he was released in 2011.

The plaintiff was charged with several felonies as a result of his resistance during the cell transfer, including battery by a prisoner under Wis. Stat. § 940.20(1), disorderly conduct under Wis. Stat. § 947.01 and violation of county prison rules pursuant to Wis. Stat. § 946.73 for failure to comply with commands.[2] Due to these charges, Kenosha County Sheriff's Department conducted an investigation of the incident on December 28, 2010, and prepared a Supplemental Report on December 29, 2010.

Deputy William Soppe interviewed the Jail staff and the plaintiff, who was

---

[2] These charges are more fully described in Kenosha County Case Number 11-CF-11.

6

Case 2:11-cv-00363-RTR   Filed 01/09/13   Page 6 of 17   Document 98

transported to the Kenosha County Sheriff's Department Detective Bureau while still in the restraint chair because the interview needed to be recorded pursuant to Wis. Stat. § 968.073(2). The interview began at approximately 8:30 p.m. and the plaintiff signed a Waiver of Constitutional Rights document after being read his Miranda rights by Deputy Soppe. As part of the investigation, the plaintiff also completed a written statement. The interview concluded at 9:25 p.m. The plaintiff admitted he had engaged in disruptive conduct contrary to Jail rules by attempting to loosen the Velcro straps. He also admitted that he was given verbal commands to kneel on the bench in the holding cell, but he told Deputy Soppe he complied with these commands.

Once transported to the Zone One Protective holding cell in the HSU, an inmate secured in the restraint chair is evaluated by the on-duty nursing staff. Thereafter, HSU nursing staff evaluates the inmate every two hours. These checks are documented on "Water Intake Logs" and "Suicide/Mental Health Behavior Logs." (Willstead Aff. ¶¶ 18, 19, Exs. H, I.) Upon arriving at the HSU, the plaintiff's restraints were checked and approved by defendant Nurse Hauck and a 15-minute watch commenced. Water Intake Logs for December 28, 2010, show that HSU staff performed restraint checks and offered the plaintiff water at 3:30 p.m., 5:30 p.m., 6:15 p.m., 8:15 p.m., 10 p.m., and 12:30 a.m. on December 29, 2010. Additionally, the plaintiff was interviewed by Deputy Soppe from 8:30 p.m. to 9:25 p.m.

The Behavior Log for December 28, 2010, shows that observations of the plaintiff's wellbeing and mood were noted every 15 minutes beginning at 3:55 p.m. and ending at 11:00 p.m. These logs note nurse observations and any complaints of physical injury. Observation notations state that the plaintiff continued to exhibit disruptive and threatening behavior toward the nurses and officers while in the restraint chair in the HSU. The plaintiff did not complain of any specific

7

injuries during this time. A Health Services visit note from 7:15 a.m. on December 29, 2010 states that the plaintiff was complaining of "superficial scrapes and marks" on his wrists and forearms that did not require any treatment. There is no mention of any hernia complaints. By 8:00 p.m. on December 31, 2010, medical records note that the plaintiff was acting in a disorderly manner and smearing his feces all over is cell; therefore, the nurse did not examine the plaintiff due to safety concerns. Water Intake Logs from December 28, 2010, note that the plaintiff used the bathroom at 3:30 p.m. and again at 3:30 a.m on December 29, 2010. The Behavior Log also states that the plaintiff took a bathroom break at 11:00 p.m. on December 28, 2010.

Whenever Jail staff is required to use force in a defensive situation, the staff member must prepare a Defensive Action Report in addition to the Uniform Disciplinary Action Report and any Supplementary Investigation Reports. The Uniform Disciplinary Action Report lists any rules violated and categorizes the offense(s) as "major" or "minor." "Major" violations also provide for a disciplinary hearing, which the inmate may also waive. The officer completing the Uniform Disciplinary Action Report generally asks the inmate if he waives his hearing. If a situation is still volatile, an officer who was not involved in the incident may ask the inmate about waiver and report the response to the reporting officer. The supervising officer also must complete a Supervisory Review Form when Jail staff uses force in a defensive situation. This review should include a description of the "totality of the circumstances" and "articulate the level and reasonableness of force used." (Willstead Aff. ¶ 20, Ex. J.) These forms are provided to the hearing officer prior to the disciplinary hearing. Regardless of whether the inmate waives his disciplinary hearing, he is provided a copy of the Uniform Disciplinary Action Report and of the Disciplinary Hearing Report stating the disposition of the alleged violations. The hearing report states that the inmate may appeal

8

the results within ten days by completing an Inmate Request Form addressed to the hearing officer.

As a result of the incident on December 28, 2010, defendant Gerena completed a Uniform Disciplinary Action Report, Defensive Action Report, and a Supplementary Investigation Report. Prior to submitting his report, defendant Gerena verified that the plaintiff waived his hearing on the Uniform Disciplinary Action Report. Defendant May completed a Defensive Action Report and a Supplementary Investigation Report. Defendant Leiting completed a Supplementary Investigation Report and a No Consent Form. Defendant Bernhardt completed a Supplementary Investigation Report. As shift supervisor, defendant Corrao completed the Supervisory Review Form. Defendant Corrao found that all officers followed departmental policy and the use of force was appropriate to the incident.

Based on the reports of the investigation and the plaintiff's waiver of the hearing reflected in the Uniform Disciplinary Action Report, defendant Haney completed a Disciplinary Hearing Report on Decmeber 29, 2010, sustaining each of the violations. The Report noted that the plaintiff had waived his hearing and that the plaintiff was provided a copy of the Hearing Report on December 29, 2010. Pursuant to Jail policy as stated on the Report, the plaintiff had ten days to appeal the findings of defendant Haney, but he did not do so. He also did not submit an Inmate Grievance/Appeal Form or an Inmate Request Form following the hearing.

**B. Defendant Hauck's Proposed Findings of Fact**

Defendant Nurse Hauck is an employee of the Kenosha Visiting Nurse Association, an independent contractor providing nursing services for the Jail. Defendant Hauck assessed the

9

plaintiff on December 27, 2010, after the incident involving the Jail officers.[3] She noted a broken pinky nail on his right hand with small superficial scratches. The plaintiff also complained of preexisting wrist pain. Defendant Hauck noted no redness, swelling, or bruising, and full range of motion was noted with some slight tenderness upon palpation.

On December 28, 2010, at approximately 10:00 a.m., the plaintiff filed an Inmate Medical Request Form that stated he had "wrist, elbow, hernia and hands are all in pain." (Hauck Dec. ¶ 12, Ex A.) The physician notes for that date indicate that the plaintiff was seen for segregation evaluation and reported no complaints. At about 3:30 p.m., the plaintiff was escorted to Zone 1 in a restraint chair with a spit hood on, yelling and swearing at officers. Defendant Hauck assessed the plaintiff and determined that the restraints were checked with circulation, sensation, and motion all within normal limits for all four extremities. The plaintiff was yelling profanities at her and the Jail staff. Defendant Hauck checked the plaintiff again within two hours while he was still in the restraint chair. Again, all four extremities were checked and determined to be within normal limits for circulation, sensation, and motion. At this time, the plaintiff was calm and talking to defendant Corrao. He was noted to be talking to defendant Carrao at 5:40 p.m. until 6:15 p.m. At 7:45 p.m., the plaintiff was in the detective bureau and the restraints were unable to be checked. At 9:45 p.m., the plaintiff was still in the restraint chair. His restraints were checked and his skin was warm and dry; circulation sensation and motion were in tact. The plaintiff was removed from the restraint chair at 9:50 p.m.

On December 29, 2010, the plaintiff was observed at 7:15 a.m. At that time, he

---

[3] According to defendant Hauck, the incident took place on December 27, 2010, instead of December 28, 2012, as described by the Kenosha County defendants. Despite the date discrepancy, they are describing the same incident.

requested Band-Aids for superficial scrapes on his wrists and forearms. The plaintiff was instructed to keep the scrapes clean and dry. He did not mention any pain or problem with the shoulder, neck, or hernia.

At all times material to the care and treatment of the plaintiff, defendant Hauck performed her nursing duties within the appropriate standard of care for nurses and in conformity with the standard and customary procedure within the Jail.

### III. ANALYSIS

The Kenosha County defendants contend that the plaintiff's claims should be dismissed as a matter of law. Defendant Hauck, who is only implicated in the plaintiff's medical care claims, contends that the constitutional medical care and state law medical malpractice claims should be dismissed. The plaintiff filed one brief in response to both motions. In it, he reiterates his amended complaint allegations that he was physically assaulted on December 28, 2010, and denied medical attention. The plaintiff further asserts that, although he was told he waived a disciplinary due process hearing following the incident, he was never asked if he wanted a hearing.

**A. Excessive Force and Failure to Intervene Claims**

The Fourteenth Amendment right to due process provides the appropriate constitutional standard against which to measure the plaintiff's excessive force claim because he was a pretrial detainee at the time. *See Forrest v. Prine*, 620 F.3d 739, 743 (7th Cir. 2010). "The Fourteenth Amendment right to due process provides at least as much, and probably more, protection against punishment as does the Eighth Amendment's ban on cruel and unusual punishment," *Id.* at 744 (citing *Lewis v. Downey,* 581 F.3d 467, 473–74 (7th Cir. 2009)); *see also Bell v. Wolfish,* 441 U.S. 520, 537 (1979). The central concern of that due process right is to ensure that the accused are

11

not subjected to "excessive force that amounts to punishment," *Graham v. Connor,* 490 U.S. 386, 395 n.10 (1989). But not every use of force is a punishment: "Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention." *Bell,* 441 U.S. at 537.

The exact contours of the additional safeguards found in an excessive force claim under the Fourteenth Amendment remain undefined. *Lewis*, 581 F.3d at 474 (citing *Wilson v. Williams*, 83 F.3d 870, 875 (7th Cir. 1996)) (Supreme Court has declined to say whether the standard for pretrial detainee excessive force cases is the "reasonableness" standard of the Fourth Amendment, or some other intermediate standard). However, the Court of Appeals for the Seventh Circuit has held that to prevail on a Fourteenth Amendment claim, a plaintiff must prove that the defendants "acted deliberately or with callous indifference, evidenced by an actual intent to violate [the plaintiff's] rights or reckless disregard for his rights." *Wilson*, 83 F.3d at 875 (quoting *Anderson v. Gutschenritter*, 836 F.2d 346, 349 (7th Cir. 1988)). Additionally, "[m]ost of the time the propriety of using force on a person in custody pending trial will track the Fourth Amendment: the court must ask whether the officials behaved in a reasonable way in light of the facts and circumstances confronting them." *Wilson*, 83 F.3d at 875 (quoting *Titran v. Ackman*, 893 F.2d 145, 147 (7th Cir. 1990).

In this case, the undisputed facts establish that the plaintiff failed to follow orders throughout the incident. He resisted officers' efforts to re-secure him, and his behavior deteriorated from there. The plaintiff head-butted defendant Leitig, and he kicked and fought against the officers. He also threatened to kill the officers. The defendants' actions were an attempt to gain the plaintiff's compliance and there is no indication that any officer acted unreasonably, given the plaintiff's

12

actions and the fact that plaintiff suffered inconsequential injuries in the process. *See Forrest*, 620 F.3d at 745-46 (concluding that officer's use of force was reasonable where detainee threatened aggression, disruption, and physical attack). Because no reasonable fact finder could conclude that the defendants used excessive force against the plaintiff, his claim that the defendants failed to intervene in the use of excessive force also fails. *See Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004).

**B. Medical Care Claims**

It is well-established that a pretrial detainee must be afforded certain protections under the Fourteenth Amendment, including access to adequate medical care. *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 764 (7th Cir. 2002) (citations omitted). Due process rights are at least as great as the protections afforded a convicted prisoner under the Eighth Amendment. *Id.* Accordingly, when considering a pretrial detainee's claim of inadequate medical care, the analogous standards under the Eighth Amendment are often used. *Id.*

A prisoner's claim for deliberate indifference must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition." *Arnett v. Webster,* 658 F.3d 742, 750 (7th Cir. 2011). "A medical need is considered sufficiently serious if the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Roe v. Elyea,* 631 F.3d 843, 857 (7th Cir. 2011) (internal quotation marks and punctuation omitted). The medical condition need not be life-threatening; "it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id.* (quoting *Gayton v. McCoy,* 593 F.3d 610, 620 (7th Cir. 2010)). Deliberate indifference is proven by demonstrating that a prison official

13

knows of a substantial risk of harm to an inmate and "either acts or fails to act in disregard of that risk." *Arnett*, 658 F.3d at 751. Delaying treatment may constitute deliberate indifference if such delay "exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick,* 612 F.3d 636, 640 (7th Cir. 2010) (citing *Estelle,* 429 U.S. at 104-05).

Here, as an initial matter, it is dubious that the plaintiff suffered from a serious medical need. He received "superficial scrapes and marks" on his wrists and forearms that did not require treatment as a result of the incident. The plaintiff also alleges that he received "two small bumps" on his head from his head hitting the floor and that the restraints caused discomfort to his hernia. These injuries are probably not "serious medical needs." *See Pinkston v. Madry*, 440 F.3d 879, 891 (7th Cir. 2006) (a split lip and a swollen cheek do not rise to the level of an objectively serious medical need). However, even if the plaintiff did suffer from a serious medical need, the record establishes that after the incident the plaintiff was taken to the HSU and closely monitored for several hours. These facts do not support a deliberate indifference claim.

The court turns to the plaintiff's state law claim. Wisconsin law defines medical negligence as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort*, 227 Wis. 2d 124, 149, 595 N.W.2d 423, 435 (1999); *Schuster v. Altenberg*, 144 Wis. 2d 223, 229, 424 N.W.2d 159, 161-62 (1988).

Like all claims for negligence, a claim for medical malpractice includes the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff. *Paul v. Skemp*, 2001 WI 42 ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860 (2001). Thus, to establish a prima facie medical negligence claim, the plaintiff must show that defendant Hauck failed to use the required

14

degree of skill exercised by an average nurse, that he was harmed, and that there is a causal connection between the failure and his harm. Wis. J-I Civil 1023; *see Wade v. Castillo*, 658 F. Supp. 2d 906, 919 (W.D. Wis. 2009).

In this case, the plaintiff has not submitted expert testimony to support a finding of negligence. Unless the situation is one in which common knowledge affords a basis for finding negligence, medical malpractice cases require expert testimony to establish the standard of care. *Carney-Hayes v. Nw. Wisconsin Home Care, Inc.*, 2005 WI 118 ¶ 35, 284 Wis. 2d 56, 699 N.W.2d 524 (2005). The record establishes that defendant Hauck used the appropriate nursing standard in treating the plaintiff. Thus, his negligence claim fails.

**C. Due Process Claim**

The Supreme Court has held that a pretrial detainee may not be punished for misconduct while in custody without due process. *Bell v. Wolfish,* 441 U.S. 520, 535-37 (1979); *see also Higgs v. Carver,* 286 F.3d 437, 438-39 (7th Cir. 2002); *Zarnes v. Rhodes,* 64 F.3d 285, 291 (7th Cir. 1995). A pretrial detainee can be placed in segregation for a disciplinary infraction, but that detainee must receive "notice and an opportunity to be heard". . . "[b]ut no process is required if he is placed in segregation not as punishment but for managerial reasons." *Higgs,* 286 F.3d at 438 (citations omitted).

In this case, on December 29, 2010, the plaintiff waived a disciplinary hearing from the December 28, 2010, incident. He received a 68-day segregation disposition as punishment for the incident.

The defendants first contend that notice was not constitutionally required because the plaintiff received conduct citations and was placed in segregation for security reasons. They further

15

contend that since the plaintiff was already in segregation for security reasons before the incident, the continuation of that status for 68 days did not implicate his due process rights because it did not result in a significant change in his conditions. However, the cases which refer to conditions which constitute "an atypical or significant hardship in relation to the ordinary incidents of prison life" refer to convicted prisoners, not pretrial detainees. *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The fact remains that the plaintiff was a pretrial detainee who was sentenced to segregation for 68 days as punishment and he was, therefore, entitled to notice and an opportunity to be heard. *Higgs*, 286 F.3d at 438.

Next, the defendants contend that due process was provided. The plaintiff alleges in his sworn amended complaint that he did not know he waived a disciplinary hearing. However, in response to summary judgment, a "[p]laintiff may not rely only on the bare assertions of his pleadings." *See Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008) (quoting *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 651 (7th Cir. 2006)). The defendants' proposed findings of fact establish that the plaintiff was notified on December 28, 2010, that his disciplinary hearing was scheduled for the following day. The plaintiff indicated that he waived his hearing and his decision was recorded on defendant Gerena's Uniform Disciplinary Action Report, which was forwarded to defendant Haney in advance of the scheduled hearing. Therefore, the undisputed facts establish that the plaintiff was provided with notice and an opportunity to be heard in the form of a disciplinary hearing, as due process requires. Hence, his due process claim fails.

Lastly, the plaintiff did not appeal the findings of his disciplinary hearing nor did he submit an Inmate Grievance/Appeal Form or an Inmate Request Form following the hearing. Thus, he failed to exhaust administrative remedies as to his due process claim. *See* 42 U.S.C. § 1997e(a).

16

Case 2:11-cv-00363-RTR   Filed 01/09/13   Page 16 of 17   Document 98

**IT IS THEREFORE ORDERED** that defendants Beth, Leiting, Gerena, May, Carrao, Haney, Willstead, Bernhardt, and Rae's motion for summary judgment (Docket #81) is **granted**.

**IT IS FURTHER ORDERED** that defendant Hauck's motion for summary judgment (Docket #95) is **granted**.

**IT IS FURTHER ORDERED** that this case is **dismissed**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 9th day of January, 2013.

                                                **SO ORDERED,**

_/s/ Rudolph T. Randa_
**HON. RUDOLPH T. RANDA**
**U. S. District Judge**